**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GERGELY SOMOGYI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ORGANOGENESIS HOLDINGS INC., GARY S. GILLHEENEY, SR., and DAVID C. FRANCISCO,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gergely Somogyi ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Organogenesis Holdings Inc. ("Organogenesis" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Organogenesis securities

between March 17, 2021 and October 11, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Organogenesis is a regenerative medicine company that develops, manufactures, and commercializes solutions for the advanced wound care and surgical and sports medicine markets in the U.S.  The Company's products include, among others, "Affinity" and "PuraPly XT".  Affinity is a wound covering product used to support the treatment of a variety of wound sizes and types.  PuraPly XT is an antimicrobial barrier used for a broad variety of wound types.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Organogenesis improperly billed the federal government for its Affinity and PuraPly XT products by, among other things, setting the price for those products multiple times higher than similar products; (ii) the Company improperly induced doctors to use its Affinity and PuraPly XT products through lucrative reimbursements; (iii) as a result of all the foregoing, the Company's revenue and profits derived from its Affinity and PuraPly XT products were at least in substantial part unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.      On October 12, 2021, an anonymous short report addressing Organogenesis was published on Value Investors Club, an online website where investors share investment ideas (the "VIC Report").  The VIC Report alleged, among other issues, that the Company has been improperly billing the federal government for $250 million annually.  The VIC Report also alleged

2

that the Company had set the price for its new wound covering, Affinity, "exorbitantly high[,]" which Medicare reimbursed, while making the product lucrative for doctors to use through large rebates, and that the Company employed a similar tactic for its new PuraPly XT product.

5.     On this news, Organogenesis' stock price fell $1.70 per share, or 14.11%, to close at $10.35 per share on October 12, 2021.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Organogenesis' most recent annual report on Form 10-K, as of February 28, 2021, the Company had 127,985,190 shares of its Class A common stock outstanding.  Organogenesis' Class A common stock trades on the Nasdaq Capital Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Organogenesis securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff, as set forth in the attached Certification, acquired Organogenesis securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12.     Defendant Organogenesis is a Delaware corporation with principal executive offices located at 85 Dan Road, Canton, Massachusetts 02021.  Organogenesis' Class A common stock trades in an efficient market on the NASDAQ under the ticker symbol "ORGO".

13.     Defendant Gary S. Gillheeney, Sr. ("Gillheeney") has served as Organogenesis' President, Chief Executive Officer, and a Director of the Company at all relevant times.

14.     Defendant David C. Francisco ("Francisco") has served as Organogenesis' Chief Financial Officer at all relevant times.

15.     Defendants Gillheeney and Francisco are sometimes referred to herein as the "Individual Defendants."

16.     The Individual Defendants possessed the power and authority to control the contents of Organogenesis' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Organogenesis' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Organogenesis, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being

made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

17.    Organogenesis and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Organogenesis is a regenerative medicine company that develops, manufactures, and commercializes solutions for the advanced wound care and surgical and sports medicine markets in the U.S.  The Company's products include, among others, "Affinity" and "PuraPly XT".  Affinity is a wound covering product used to support the treatment of a variety of wound sizes and types.  PuraPly XT is an antimicrobial barrier used for a broad variety of wound types.  Affinity and PuraPly XT sales are reflected in the Company's results for its Advanced Wound Care products and its and Surgical & Sports Medicine products.

### Materially False and Misleading Statements Issued During the Class Period

19.    The Class Period begins on March 17, 2021.  On March 16, 2021, during post-market hours, Organogenesis issued a press release announcing the Company's fourth quarter and fiscal year 2020 financial results (the "4Q/FY20 Press Release").  That press release reported, among other results, "[n]et revenue of $106.8 million for the fourth quarter of 2020, up 43% compared to net revenue of $74.6 million for the fourth quarter of 2020"; "[n]et revenue from Advanced Wound Care products for the fourth quarter of 2020 of $93.6 million, an increase of 48% from the fourth quarter of 2019"; "[n]et revenue from Surgical & Sports Medicine products for the fourth quarter of 2020 of $13.2 million, an increase of 17% from the fourth quarter of 2019"; and "[g]ross profit for the fourth quarter of 2020 [of] $81.3 million, or 76% of net revenue,

compared to $54.3 million, or 73% of net revenue, for the fourth quarter of 2019, an increase of $27.0 million, or 50%."

20.     The 4Q/FY20 Press Release also reported, among other results, full year "[n]et revenue of $338.3 million for the year ended December 31, 2020, up 30% compared to net revenue of $261.0 million for the year ended December 31, 2019"; full year "[n]et revenue from Advanced Wound Care products of $294.6 million, up 33% year-over-year"; full year "[n]et revenue from Surgical & Sports Medicine products of $43.7 million, up 9% year-over-year"; and full year gross profits of approximately $251 million.

21.     With respect to Organogenesis' fourth quarter 2020 results, the 4Q/FY20 Press Release attributed "[t]he increase in Advanced Wound Care net revenue . . . primarily . . . to the expanded sales force, increased sales to existing and new customers, and increased adoption of our amniotic product portfolio, including our Affinity product"; "[t]he increase in Surgical & Sports Medicine net revenue . . . primarily . . . to the expanded sales force and penetration of existing and new customer accounts"; and "[t]he increase in gross profit . . . primarily [to] increased sales volume due to the strength in our Advanced Wound Care and Surgical & Sports Medicine products as well as a shift in product mix to our higher gross margin products."

22.     The 4Q/FY20 Press Release also quoted Defendant Gillheeney, who represented, in relevant part:

> "We delivered fourth quarter revenue growth of 43% year-over-year, which was well ahead of our guidance . . . . Our Q4 results reflect a continuation of the key drivers of our growth strategy including: the investments we have made to expand our sales force in recent years, the benefits of our comprehensive, and differentiated, portfolio of products that address patients' needs to treat wounds across all stages and our commercial strategy focused on leveraging multiple channels, new product introductions, and brand loyalty. Strong execution of our strategy drove not only impressive revenue growth, but also, significant improvement in our profitability as evidenced by the 20% operating margins,

positive GAAP net income and generating $25 million in adjusted EBITDA this quarter."

[. . . .] "Despite the challenging operating environment caused by the COVID-19 pandemic, we believe the fundamentals of our business and strategy remain strong and that we are well positioned to deliver strong operating and financial performance in 2021. Our guidance reflects our expectations to grow our revenue 15% to 20% year-over-year and to generate positive GAAP net income and Adjusted EBITDA for the full year 2021 period. We remain confident in our ability to execute our long-term strategic plan of driving strong commercial execution, continued development of our new product pipeline, and improvement of our profitability profile. As always, we are committed to delivering on our mission to provide integrated healing solutions that substantially improve medical outcomes *while lowering the overall cost of care*."

(Emphasis added.)

23.     Also on March 16, 2021, during post-market hours, Organogenesis filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K reaffirmed the Company's full year 2020 net revenue, advanced wound care revenue, surgical and sports medicine revenue, and gross profit results as reported in the 4Q/FY20 Press Release, and attributed those results to substantively the same purported business drivers as referenced in ¶ 21, *supra*.

24.     The 2020 10-K also stated, in relevant part, that "[s]everal factors affect our reported revenue in any period, including . . . pricing realization, marketing and promotional efforts . . . [and] regulatory actions including healthcare reimbursement scenarios[.]"

25.     Similarly, the 2020 10-K also represented that "[o]ur gross profit and gross profit margin are affected by . . . realized pricing of our products," and that "[r]egulatory actions, including healthcare reimbursement scenarios, which may require costly expenditures or result in pricing pressures, may decrease our gross profit and gross profit margin."

26.     With specific respect to reimbursement, the 2020 10-K stated, in relevant part:

Our customers primarily consist of hospitals, wound care centers, government facilities, ASCs and physician offices, all of whom rely on coverage and reimbursement for our products by Medicare, Medicaid and other third-party payers. Governmental insurance programs, such as Medicare and Medicaid, typically have published and defined coverage criteria and published reimbursement rates for medical products, services and procedures that are established by law or regulation. Non-government payers have their own coverage criteria and often negotiate payment rates for medical products, services and procedures. Many also require prior authorization as a prerequisite to coverage. In addition, in the United States, an increasing percentage of insured individuals are receiving their medical care through managed care programs, which monitor and also may require prior authorization for the products and services that a member receives. Coverage and reimbursement from government and commercial payers is not assured and is subject to change.

\* \* \*

Currently, Medicare makes a separate payment for our products when used in the physician office at a payment rate of average sales price (ASP) plus 6%. Legislation was recently enacted that temporarily discontinued the sequestration rate of 2% of the government portion which resulted in a final payment rate of ASP+4.3%. The sequestration will begin again on April 1, 2021. In the outpatient hospital and ASC settings, Medicare payment for all our products is bundled into the payment for the application procedure.

27.     Appended as an exhibit to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified "that the [2020 10-K] complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] and that information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

28.     On May 10, 2021, Organogenesis issued a press release announcing the Company's first quarter 2021 financial results (the "1Q21 Press Release").  That press release reported, among other results, "[n]et revenue of $102.6 million for the first quarter of 2021, up 66% compared to net revenue of $61.7 million for the first quarter of 2020"; "[n]et revenue from Advanced Wound Care products for the first quarter of 2021 of $90.7 million, an increase of 77% from the first quarter of 2020"; "[n]et revenue from Surgical & Sports Medicine products for the first quarter of

2021 of $11.8 million, an increase of 13% from the first quarter of 2020"; and "[g]ross profit for the first quarter of 2021 [of] $77.1 million, or 75% of net revenue, compared to $42.9 million, or 70% of net revenue, for the first quarter of 2020, an increase of $34.1 million, or 79%."

29.    The 1Q21 Press Release attributed "[t]he increase in net revenue [to] . . . a $39.4 million increase, or 77%, in net revenue of Advanced Wound Care products and a $1.4 million increase, or 13%, in net revenue of Surgical & Sports Medicine products, compared to the first quarter of 2020[,]" and "[t]he increase in gross profit . . . primarily [to] increased sales volume due to the strength in our Advanced Wound Care and Surgical & Sports Medicine products as well as a shift in product mix to our higher gross margin products."

30.    The 1Q21 Press Release also quoted Defendant Gillheeney, who represented, in relevant part:

"We delivered significant year-over-year revenue growth across both our Advanced Wound Care and Surgical and Sports Medicine portfolios driven by strong sales of our amniotic and PuraPly products . . . . With continued strong execution against our commercial strategy, we also significantly improved our profitability."

[. . . .] "The fundamentals of our business and strategy remain strong and we are well positioned to continue to deliver strong operating and financial performance over the balance of 2021. We remain confident in our ability to execute our long-term strategic plan as we deliver on our mission to provide integrated healing solutions that substantially improve medical outcomes *while lowering the overall cost of care*."

(Emphasis added.)

31.    On May 11, 2021, Organogenesis filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q reaffirmed the Company's net revenue, advanced wound care revenue, surgical and sports medicine revenue, and gross profit results as reported in the 1Q21 Press Release.

32.     The 1Q21 10-Q attributed "[t]he increase in Advanced Wound Care net revenue . . . primarily . . . to the expanded sales force, increased sales to existing and new customers and increased adoption of our amniotic product portfolio, including our Affinity product"; "[t]he increase in Surgical & Sports Medicine net revenue . . . primarily . . . to the expanded sales force and penetration of existing and new customer accounts"; and the increase in gross profit to the same business drivers identified in ¶ 29, *supra*.

33.     The 1Q21 10-Q also contained the same statements as referenced in ¶¶ 24-25, *supra*, with respect to factors affecting Organogenesis' reported revenue and profits, including, *inter alia*, its products' pricing, marketing, and reimbursement scenarios.

34.     Appended as an exhibit to the 1Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

35.     On August 9, 2021, Organogenesis issued a press release announcing its second quarter and first half of 2021 financial results (the "2Q21 Press Release").  That press release reported, among other results, "[n]et revenue of $123.2 million for the second quarter of 2021, up 79% compared to net revenue of $69 million for the second quarter of 2020"; "[n]et revenue from Advanced Wound Care products for the second quarter of 2021 of $111.4 million, an increase of 87% from the second quarter of 2020"; "[n]et revenue from Surgical & Sports Medicine products for the second quarter of 2021 of $11.8 million, an increase of 27% from the second quarter of 2020"; and "[g]ross profit for the second quarter of 2021 [of] $93.3 million, or 76% of net revenue, compared to $48.9 million, or 71% of net revenue, for the second quarter of 2020, an increase of $44.3 million, or 91%."

36.     The 2Q21 Press Release attributed "[t]he increase in net revenue [to] . . . a $51.7 million increase, or 87%, in net revenue of Advanced Wound Care products and a $2.5 million

increase, or 27%, in net revenue of Surgical & Sports Medicine products, compared to the second quarter of 2020[,]" and "[t]he increase in gross profit . . . primarily [to] increased sales volume due to the strength in our Advanced Wound Care and Surgical & Sports Medicine products as well as a shift in product mix to our higher gross margin products."

37.     The 2Q20 Press Release also quoted Defendant Gillheeney, who represented, in relevant part:

> "We delivered 79% year-over-year revenue growth with strong contributions across both our Advanced Wound Care and Surgical and Sports Medicine portfolios as well as significantly improved profitability."
>
> [. . . .] "As we enter the second half of 2021, we remain focused on executing our commercial strategy and believe we are well positioned to continue to deliver strong operating and financial results. Given the deep dedication to the patients we serve, we remain confident in our ability to provide integrated healing solutions that substantially improve medical outcomes ***while lowering the overall cost of care***."

(Emphasis added.)

38.     Also on August 9, 2021, Organogenesis filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q reaffirmed the Company's net revenue, advanced wound care revenue, surgical and sports medicine revenue, and gross profit results as reported in the 2Q21 Press Release.

39.     The 2Q21 10-Q attributed "[t]he increase in Advanced Wound Care net revenue . . . primarily . . . to the expanded sales force, increased sales to existing and new customers and increased adoption of our amniotic product portfolio, including our Affinity product"; "[t]he increase in Surgical & Sports Medicine net revenue . . . primarily . . . to the expanded sales force and penetration of existing and new customer accounts"; and the increase in gross profit to the same business drivers identified in ¶ 36, *supra*.

40.     The 2Q21 10-Q also contained the same statements as referenced in ¶¶ 24-25, *supra*, with respect to factors affecting Organogenesis' reported revenue and profits, including, *inter alia*, its products' pricing, marketing, and reimbursement scenarios.

41.     Appended as an exhibit to the 2Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 27, *supra*, signed by the Individual Defendants.

42.     The statements referenced in ¶¶ 19-41 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Organogenesis improperly billed the federal government for its Affinity and PuraPly XT products by, among other things, setting the price for those products multiple times higher than similar products; (ii) the Company improperly induced doctors to use its Affinity and PuraPly XT products through lucrative reimbursements; (iii) as a result of all the foregoing, the Company's revenue and profits derived from its Affinity and PuraPly XT products were at least in substantial part unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

43.     On October 12, 2021, during pre-market hours, the VIC Report was published on Value Investors Club, an online, members'-only website where investors share investment ideas. The VIC Report alleged, among other issues, that the Company has been improperly billing the federal government for $250 million annually.  The VIC Report also alleged that the Company had set the price for its new wound covering, Affinity, "exorbitantly high[,]" which Medicare

reimbursed, while making the product lucrative for doctors to use through large rebates, and that the Company employed a similar tactic for its new PuraPly XT product.

44.     Specifically, the VIC Report alleged that, after being pulled off the market in the first quarter of 2019, Organogenesis "br[ought] Affinity back with 5-10x normal pricing" in the second quarter of 2020, before which "Affinity was a small single digit percentage of sales and priced comparable to other amniotic products at ~$150/sq cm."  According to the VIC Report, "Affinity is now ~40% of sales, priced 4x higher than comparable amniotics, and is 100% of [the Company]'s non-PuraPly related growth."  In explaining this growth, the VIC Report stated that "[n]ew products that don't have a Medicare/CMS [Centers for Medicare & Medicaid Services] price[,]" which "takes a few quarters and sufficient volume before CMS sets a price[,] are priced by the Company in the Red Book[,]" which "is a 'wholesale' price . . . that the government will follow until CMS determines reimbursement based on actual sales prices."  The VIC Report alleged that "Organogenesis didn't sell Affinity at wholesale or to hospitals, so management set the Red Book price exorbitantly high[,]" which "could have been upwards of $800-1000/sqcm - or $2k to $6k for Affinity's two sizes."  The VIC Report also alleged that "Medicare accepts this price and reimbursed providers at the Company determined rate[,]" thereby suggesting "[w]holesale price manipulation[,]" which "is a common area of Medicare fraud."

45.     Moreover, according to the VIC Report, "Organogenesis gave doctors, often ethically questionable podiatrists that had been hurting from covid, rebates on Affinity[,]" and "[t]hese rebates could be upwards of 30% and the doctors pocket the spread between the reimbursed amount and what they paid Organogenesis."  The author of the VIC Report "estimate[d] a profit of $500-$2,000+ per application[,]" while noting that "[m]arketing the

spread"—*i.e.*, "convincing doctors to use a product based upon how much they make"—"is illegal[,]" and that "I have been told Organogenesis sales reps break these rules."

46.     According to the VIC Report, "Affinity was very profitable for doctors to use and Affinity drove almost all of Organogenesis growth[,]" so "[t]he Company decided to exploit the same loophole with its new PuraPly XT product."  However, according to the VIC Report, these practices were unsustainable.  For example, the VIC Report alleged that Organogenesis' "Affinity game ended on 7/1/21 when CMS set a price of $584/sq cm[,]" which "means that instead of collecting a large spread and making thousands in profit per use, Doctors will only be reimbursed for the cost of the product plus 6%, which is the industry standard[,]" thereby reducing doctor incentives to use Affinity.  The VIC Report also cited "[i]ndustry experts" who "told [the author that] CMS is extremely frustrated with Organogenesis because private companies have stolen [the Company's] playbook to raise prices[,]" and that, "[a]s a result, NEW LEGISLATION that is effective January 2022 will require immediate reporting of all biologics pricing to Medicare so a permanent price can be set."  According to the VIC Report, "[t]his new legislation effectively ends the redbook/wholesale pricing games played by Organogenesis and others."

47.     Finally, the VIC Report alleged that Organogenesis "potentially lost ~40% of sales, ~100% of growth, and over 100% of profits"; that "Organogenesis [might be] under investigation[,]" like "Eargo (EAR)[, which] stopped receiving payment from the government for their hearing aid device earlier in the year and a few months later . . . announced a DOJ investigation"; that "[i]ndustry contacts have mentioned that some large Affinity users are being audited by Medicare"; that the author "was told CMS was very liberal with reimbursement during covid in order to help keep doctors financially afloat, but they are now clawing back questionable reimbursement payments"; that the author "estimate[s] Organogenesis ripped off Medicare to the

tune of $250+ million through Affinity and PuraPlyXT[,]" with "$250mm of [the Company's] sales equat[ing] to $360mm of CMS payments at a 30% spread"; and that "[i]nsiders . . . have sold over $140mm of stock and the recent drop of Affinity from CMS coverage suggests the game is ending."

48.     On this news, Organogenesis' stock price fell $1.70 per share, or 14.11%, to close at $10.35 per share on October 12, 2021.

49.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Organogenesis securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Organogenesis securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Organogenesis or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Organogenesis;

- whether the Individual Defendants caused Organogenesis to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Organogenesis securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

56.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Organogenesis securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Organogenesis securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

57.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

58.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

61.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Organogenesis securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Organogenesis securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

62.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Organogenesis securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Organogenesis' finances and business prospects.

63.     By virtue of their positions at Organogenesis, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

64.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Organogenesis, the Individual Defendants had knowledge of the details of Organogenesis' internal affairs.

65.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Organogenesis.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Organogenesis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public

statements, the market price of Organogenesis securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Organogenesis' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Organogenesis securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

66. During the Class Period, Organogenesis securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Organogenesis securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Organogenesis securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Organogenesis securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

67. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

69.  Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.  During the Class Period, the Individual Defendants participated in the operation and management of Organogenesis, and conducted and participated, directly and indirectly, in the conduct of Organogenesis' business affairs.  Because of their senior positions, they knew the adverse non-public information about Organogenesis' misstatement of income and expenses and false financial statements.

71.  As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Organogenesis' financial condition and results of operations, and to correct promptly any public statements issued by Organogenesis which had become materially false or misleading.

72.  Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Organogenesis disseminated in the marketplace during the Class Period concerning Organogenesis' results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Organogenesis to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Organogenesis within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Organogenesis securities.

73.    Each of the Individual Defendants, therefore, acted as a controlling person of Organogenesis.  By reason of their senior management positions and/or being directors of Organogenesis, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Organogenesis to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Organogenesis and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

74.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Organogenesis.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 10, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Gergely Somogyi, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Organogenesis Holdings Inc. ("Organogenesis" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Organogenesis securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Organogenesis securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Organogenesis securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** _____
11/23/2021
                    **(Date)**

Gergely Somogyi
_____
                    **(Signature)**

Gergely Somogyi
_____
                 **Gergely Somogyi**

**Organogenesis Holdings Inc. (ORGO)**                                    **Somogyi, Gergely**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 9/29/2021 | 900 | $15.5000 |
| Purchase | 9/30/2021 | 100 | $14.8900 |
| Purchase | 9/30/2021 | 100 | $14.8000 |
| Purchase | 10/5/2021 | 100 | $13.9000 |
| Purchase | 10/5/2021 | 100 | $13.5500 |